UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

PRECISIONHAWK, INC.                                          CASE NO:  23-03634-5-PWM

DEBTOR                                                                CHAPTER 7

TRUSTEE'S MOTION FOR AN ORDER: (1) APPROVING BIDDING
PROCEDURES AND BREAKUP FEE FOR SALE OF CERTAIN DEBTOR'S
ASSETS; (2) AUTHORIZING SALE OF CERTAIN ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND
TRANSFERRING LIENS TO PROCEEDS OF SALE

NOW COMES John C. Bircher III, Chapter 7 Trustee (the "Trustee") in the case captioned above and files this motion (the "Motion") for an order (1) approving certain bidding procedures and breakup fee relating to the proposed sale of certain assets of Debtor; (2) authorizing the sale of such assets free and clear of all liens, claims, and encumbrances pursuant to Bankruptcy Code sections 105 and 363 and Bankruptcy Rule 6004, In support thereof, he respectfully represents as follows:

**<u>Jurisdiction and Venue</u>**

1.      This matter is a core proceeding pursuant to 28 U.S.C. § 157, and the Court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334.  The Court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984, by the United States District Court for the Eastern District of North Carolina.

2.      That on or about December 14, 2023, the above captioned Debtor filed a Petition under Chapter 7 and John C. Bircher III was appointed as Trustee. Trustee

and Debtor are also referred to herein as "Seller."

3.      The Trustee proposes to sell the property described pursuant to 11 U.S.C. §363. The Trustee has the authority to sell this Property pursuant to 11 U.S.C. §363(b).  The Property constitutes tangible and intangible rights to a website used by the Debtor to locate and contract with various independent contracting parties for connecting parties for various drone piloting activities across the country.

## The Proposed Sale of Certain Assets

4.      The Trustee proposes to sell to HAPPY DRONING, LLC, a Virginia limited liability company and/or assigns ("Buyer") the personal tangible and intangible Property described below pursuant to 11 U.S.C. §363, and the Trustee has the authority to sell this Property pursuant to 11 U.S.C. §363(f). The Property to be sold is more specifically described in the Agreement for Sale of Assets ("APA") attached as Exhibit A ("Property").

## The Offer

5.      Trustee proposes to sell the Property in the attached APA (the "Offer").  See Exhibit A.  The Offer is subject to Court approval as a portion of this Motion before becoming effective and binding.

6.      The Trustee has performed due diligence with respect to the assets and the Buyer. He is satisfied that the Offer is fair in terms of value for the Property and that the Buyer has the financial capability necessary to perform under the Offer and timely close the sale transaction contemplated therein. The Buyer is therefore a "Qualified Bidder" as that term is defined below.

7.      Under the Offer, subject to approval of this Motion and tender of funds at closing, the Buyer or its designee will purchase the Property.

8.      Pursuant to the procedures set forth herein and in the Offer, any sale agreement to be later executed pursuant thereto, and the order of this Court, the Trustee will at closing, pursuant to Section 363 of the Bankruptcy Code, and upon payment of the Purchase Price in good funds and satisfaction of all conditions, sell, transfer, and convey to the Buyer or its designee all of Debtor's right, title, and interest in and to the Buyer free and clear of any and all liens, claims and encumbrances, other than those noted in the Offer.

9.      Each party will pay all its own expenses incurred in connection with the sale including without limitation: (1) all costs and expenses stated therein to be borne by the respective parties; and (2) all their respective due diligence, accounting, legal, appraisal and similar fees.  The Offer states, however, that Trustee shall provide all documents and items required to transfer ownership of the Debtors' interest.  No broker is involved with this transaction.

10.     As set forth in the Offer, upon request of the Trustee, Buyer shall post an earnest deposit (the "Deposit") in the trust account of Trustee or other person mutually acceptable to the Trustee and Buyer in the amount of $5,000.00.  At closing, the Deposit shall be transferred to the designated bank account and credited against the Purchase Price.

## The Bidding Procedures

11.     As a condition to its offer to purchase the Property, Section 363 of the

Bankruptcy Code and the customary requirements of the Court allow third parties an opportunity to place competing or topping bids for the sale upon substantially the same terms as proposed in the Section 363 Motion and pursuant to set bidding procedures.  Those bids may be placed at any time prior to 5:00 p.m EST on the day prior to the date set for the hearing and approval by the Court of the sale.

12.    As a condition of the execution of the Offer, the Trustee has required that bidding procedures be set.  The Trustee therefore proposes that the Court approve the following bidding procedures incident to the sale of the Buyer:

(1)    If a Qualified Bidder (as defined below) has appeared and placed the minimum topping bid as set forth below, the Trustee shall hold an auction for the Asset under terms substantially similar to the Offer and the sale agreement in open court at or just before the scheduled sale motion hearing to be established on this matter (the "Sale Hearing").

(2)    The Trustee can require that potential competing bidders deliver to him evidence of financial condition, business acumen and ability to consummate a sale of the Asset in a timely manner in accordance with the terms of the Offer, this Motion, and the topping bid.  The Trustee may disqualify potential bidders who fail to demonstrate the necessary financial wherewithal and business acumen to consummate the sale. Bidders who demonstrate the necessary financial wherewithal, business acumen and ability to close timely shall each be deemed a "Qualified Bidder."

(3)    The initial competing offer by a third-party Qualified Bidder (the "Initial Overbid") for the Buyer must exceed the proposed Purchase Price by at least $10,000.00. Any successive bid following the Initial Overbid at the Sale Hearing or any auction shall exceed the immediately preceding bid by an amount of not less than $5,000.00.

(4)    The Trustee shall require that any acceptable final bid from a Qualified Bidder as made in open court upon the Sale Hearing

be: (a) immediately followed by execution of an agreement with terms and conditions substantially similar to or better than those set forth in the Offer and the Definitive Sale Agreement; (b) demonstration of an ability to close in a prompt fashion; and (c) posting of a good faith deposit of at least $5,000.00 (unless Buyer is the successful bidder, in which event its initial Deposit shall stand), no later than the first business day after the Sale Hearing, paid in the form of a certified or cashier's check or wire transfer to the Trustee's escrow account.

(5)   Upon the conclusion of the bidding process at the Sale Hearing, the Trustee shall submit the recommended highest and best bid (the "Successful Bid") to the Bankruptcy Court for approval that day.

(6)   If the holder of the Successful Bid does not timely make the required Successful Bid deposit, the next highest bidder at the auction held at the Sale Hearing shall be required to honor its next highest bid and place the Successful Bid deposit, and so on until a deposit from a Qualified Bidder is in place.

(7)   The escrow agent shall retain Buyer's Deposit until the closing of the sale of the Buyer.  If a third party has the Successful Bid, upon the closing of such Successful Bid, the escrow agent shall return to Buyer its deposit.

(8)   If another Qualified Bidder in fact places a bid on the Property, and the Buyer is not the holder of the Successful Bid at the conclusion of the bidding procedures, the Buyer will be paid, as a break-up fee, from the proceeds of the closing or from proceeds of the Successful Bid deposit, entirely according to the Trustee's discretion, the amount of $5,000.00.

(8)   Failure to post the Successful Bid deposit timely shall leave the nonperforming higher bidding parties with liability for breach of contract for the difference between the amount of the high bid and any future net sale proceeds received on the actual sale of the proceeds, plus such other claims and causes of action as may be available under North Carolina law, federal bankruptcy law, and such other law as may apply.

13.   The Trustee believes and represents that the above Bidding Procedures

are fair and reasonable under the present facts and circumstances of the case, and are intended to provide, among other things, an opportunity to generate a greater return for the sale of the real property interest. They are designed to maximize the value of the Property and ensure a fair and orderly auction process.

14.     If no topping bids are made or filed by 5:00 p.m. EST on the day prior to the date scheduled for the Sale Hearing, then upon entry by the Court of an appropriate order, the sale at the Purchase Price to Buyer upon the terms set forth in the Offer shall be declared the highest bid. Closing shall proceed as set forth in the Offer, sale order and the APA.

## The Proposed Sale Should Be Approved and the Property Sold Free and Clear

15.     The Bankruptcy Code at section 363(b)(1) provides, in pertinent part, that a trustee may, after notice and hearing, "sell, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under the Bankruptcy Code, "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case, as well as proceeds, product, offspring, rents or profits of or from property of the estate." 11 U.S.C. § 541(a)(1), (a)(6).

16.     The Trustee was appointed in this case to sell or otherwise liquidate Debtors' assets for the benefit of the bankruptcy estate and their creditors. The proposed sale of the Property for the Purchase Price is a result of these efforts. The Trustee believes that a conventional auction of the Property would not bring the

Purchase Price, and would not contain the possibility of a higher price pursuant to the Bidding Procedures set forth herein.  Further, the sale will avoid the cost of preserving the Property after the sale closing date.

17.    The proposed sale methodology allows for the possibility of a final and higher bid for the further benefit of the creditors of Debtor.  Accordingly, the Trustee believes that there is a valid business justification for selling the Property in the proposed manner and consummating such sale as quickly as possible.

18.    Pursuant to Bankruptcy Code section 363(f), a trustee may sell property of the bankruptcy estate free and clear of liens, claims, and encumbrances if one of the following conditions is satisfied:

> (1)    applicable non-bankruptcy law permits the sale of such property free and clear of such interest;
>
> (2)    the lienholder or claimholder consents;
>
> (3)    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)    such interest is in bona fide dispute; or
>
> (5)    the lienholder or claimholder could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

19.    The Trustee submits that the sale of the Property as proposed satisfies the requirements of Bankruptcy Code section 363(f).

20.    In addition, because the Property will be sold for what the Trustee, in the exercise of his reasonable business judgment, approximates current fair market

value, particularly considering the opportunity for competitive bidding and the opportunity to avoid additional substantial Chapter 7 administrative claims related to asset preservation, this sale is in the best interest of the Estate.

### Private Sale Rather Than Public Auction

21.    Bankruptcy Rule 6004(f)(1) provides that "[a]ll sales not in the ordinary course of business may be by private sale or by public auction."  Fed. R. Bankr. P. 6004(f)(1). Although public auctions are generally favored, a Chapter 7 trustee may sell assets outside the ordinary course of business by private sale when he demonstrates that the sale is permissible pursuant to section 363(b) of the Bankruptcy Code and is likely to result in a return greater than the amount reasonably forecast from a public auction.

22.    The Trustee has determined in his reasonable business judgment that the sale of the Property by a consensual private sale will serve the best interests of the bankruptcy estates and their respective creditors because, among other things: (a) an opportunity for upset bidding in a public forum is provided; (b) a public auction would only entail delay and attendant expense with no likelihood of benefit; (c) a public auction is impractical and unwieldy with respect to the nature of the interest being sold. In addition, as indicated above, a party previously expressing an interest or new parties may submit higher or better offers for the Property.

### The Proposed Sale Is Made in Good Faith

23.    Section 363(m) of the Bankruptcy Code provides, in pertinent part:
The reversal or modification on appeal of an authorization under [section 363(b) or

(c)]... of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.  11 U.S.C. § 363(m).

24.     Although the Bankruptcy Code does not define "good faith" purchaser, a Court's interpretation section 363(m) has held that "to show lack of good faith [a party] must show fraud, collusion ... or an attempt to take grossly unfair advantage of other bidders."  Because there is no bright line test, courts examine the facts of each case by concentrating on the "integrity of [an actor's] conduct during the sale proceedings."

25.     The Trustee has reviewed market conditions relative to the Property and believes that Buyer's offer is fair and reasonable under the circumstances and would be of great benefit to Debtors' estate and creditors.

26.     The Offer and sale were negotiated at arms' length and in good faith by the Trustee and Buyer.  There is no known prior connection between Debtor and Buyer.  Buyer (and any other Qualified Bidder that submits a higher or better offer for the Property), is entitled to a finding under Bankruptcy Code section 363(m) with respect to the transactions contemplated by the Offer and the sale agreement that it is deemed a good faith purchaser.

### The Stay of Bankruptcy Rule 6004(g) Should Be Waived upon Entry of the Order

27.     Bankruptcy Rule 6004(g) provides that "[A]n order authorizing the use,

sale, or lease of property other than cash collateral is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(g).

28.    Because the proposed sale inures to the benefit of the bankruptcy estate of Debtor and their creditors and requires, by the terms of the Offer and the Sale Agreement, an immediate closing, the Trustee requests a waiver of the provision in Bankruptcy Rule 6004(g) staying any order authorizing the use, sale, or lease of property until the expiration of ten (10) days after entry of the order, so that any order approving the sale would be effective immediately upon its entry.

WHEREFORE, the Trustee respectfully requests entry of orders:

1.    Conducting a hearing, authorizing and approving the proposed Bidding Procedures and Breakup Fee as set forth;

2.    At such hearing, approving the sale and assignment of the Property to Buyer or the Successful Bidder, free and clear of any liens, claims, and encumbrances with transfer of the same to the net sale proceeds;

3.    Granting such other and further relief as the Court deems just and proper.

DATED: 02/16/2024        s/John C. Bircher III
                         John C. Bircher III
                         N.C. State Bar No. 24119
                         DAVIS HARTMAN WRIGHT LLP
                         209 Pollock Street
                         New Bern, NC 28560
                         Telephone/Fascimile 252-262-7055
                         Email: jcb@dhwlegal.com

## AGREEMENT FOR SALE OF ASSETS

THIS AGREEMENT (the "Agreement") is made and entered into this_____day of February, 2024, by and among John C. Bircher III, Bankruptcy Trustee for the Estate of PrecisionHawk, Inc., a Delaware corporation, (the "Seller"), and Happy Droning LLC, a Virginia limited liability company (the "Buyer").

### W I T N E S S E T H:

WHEREAS Seller is the owner of Droners.io ("Droners"); and

WHEREAS, the Buyer desires to purchase from the Seller and the Seller desires to sell to the Buyer all of the Acquired Assets (as defined herein) related to Droners except for the Excluded Assets (as defined herein); and

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter contained, it is hereby expressly agreed by and between Seller and Buyer, subject to approval of the United States Bankruptcy Court, as follows:

1.     **Assets Sold and Purchased**

(a)     Subject to the conditions of this Agreement, Buyer agrees to purchase and Seller agrees to sell all assets related to the operation of Droners.io, including but not limited to:

(i)     Domain name of Droners.io, any and all website code (currently hosted on AWS), all code repositories (such as Github), all social media accounts and handles (including without limitation Facebook, Linkedin, Twitter (X), Instagram), names, and logins, email system, access to cloudflare (DNS), all website tools and applications, third-party API accounts, all databases (including without limitation drone operators and customers, for example) and access to all credit card processing accounts (including without limitation the Stripe account).

(ii)     Subject to all applicable legal requirements, all business and marketing records, including accounting and operating records, regulatory records, asset ledgers, inventory records, reports, budgets, customer lists, supplier lists, information and data respecting equipment acquired by Buyer, correspondence and mailing lists, email contact lists, blast/mass marketing email lists, drone operator distribution lists, newsletter sign-ups, files relating to contact with customers and prospective customers related to Droners, all technical and descriptive materials relating to Droners and all other business records, in whatever form they exist (the "Business Records").

(iii)     To the extent assignable, all governmental approvals, authorizations, certifications, consents, variances, permissions, licenses, and permits to or from, or filings, notices, or recordings to or with, federal, state, and/or local governmental authorities as well as states and jurisdictions outside of the U.S. (the "Authorizations"), but subject, as to the re-assignability to Buyer, to the procurement of any required consents or approvals, if any.

(iv)   All of the intangible rights and property related to Droners, including Intellectual Property Assets (as defined herein), going concern value, goodwill, telephone, fax and e-mail addresses and listings to the extent that they may be assigned. "Intellectual Property Assets" means all intellectual property owned or licensed (as licensor or licensee) and related to Droners in which Seller has a proprietary interest, including:

(A)  All assumed fictional business names, trade names, registered and unregistered trademarks, service marks and applications;

(B)   all patents, patent applications and inventions and discoveries that may be patentable;

(C)   all registered and unregistered copyrights in both published works and unpublished works;

(D)   all know-how, trade secrets, confidential or proprietary information, customer lists, software, technical information, data, process technology, plans, drawings and blue prints; and

(E)   all rights in internet web sites and internet domain names presently used by Seller related to Droners.

(v)   All contracts, agreements, intellectual property licenses, commitments, arrangements, and permissions to which Seller is a party, whether written or oral (the "General Contracts"); and

(vi)   All other intangible assets used or usable by Seller in connection with the operation of Droners, not specifically excluded by the terms of this Agreement, including any trademarks, service marks, franchises, copyrights in property of any kind, jingles, licenses, permits and privileges owned or held by Seller and used or useful in the operations of Droners, including any additional such rights acquired between the date hereof and the Closing Date.

(b)   It is expressly agreed and acknowledged by the parties that the following assets of Seller are not included in this sale and shall remain the property of the Seller and shall be retained by the Seller except as otherwise provided:

(i)   All bank accounts and cash on hand;
(ii)   All accounts receivable as of the Closing Date;
(iii)   All accounts payable as of the Closing Date;
(iv)   All unrelated intellectual property rights held by Seller; and
(v)   Seller's minute books, charter documents, company record books, accounting records, and such other books and records as pertain to the organization, existence or share capitalization of Seller or as are necessary to enable Seller to file its tax returns and reports.

Collectively, the assets described in this Section 1(b) are the "Excluded Assets."

(c)    Collectively, the assets described in this Section 1 other than Excluded Assets are the "Acquired Assets."

**2.    Price and Terms.** Purchase Price: The purchase price shall be the sum of $55,000.00 (the "Purchase Price") payable as follows:

At Closing (as defined herein), Buyer shall pay $55,000.00 (Fifty Thousand Dollars).

The parties hereby agree to the following allocation of the Purchase Price and further agree that for federal and state income taxes and for financial reporting purposes these allocations will be consistently followed as set forth in Form 8594 attached as Exhibit C:

(i)    Intangible property, including goodwill        $        55,000.00

**3.    Assumed Contracts.** At Closing, pursuant to an Assignment and Assumption Agreement in form substantially as set forth on Exhibit B attached hereto, Buyer shall assume the obligations accruing on or after the Closing Date (as defined herein) pursuant to those certain contracts (the "Assumed Contracts"); provided that Seller shall remain responsible for all obligations accruing prior to the Closing Date pursuant to the Assumed Contracts. Buyer shall pay all costs associated with the assumption of the contracts. Except as provided herein Buyer shall assume none of Seller's liabilities or accounts payable.

**4.    Buyer's Representations and Warranties.** Buyer represents and warrants to Seller that as of the date of this Agreement and the Closing Date:

(a)    Organization and Standing. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the Commonwealth of Virginia. Buyer has full power and authority to own or lease its properties and to carry on its business as it is now being conducted. A Certificate of Good Standing shall be provided by Buyer to Seller at Closing.

(b)    Authorization and Binding Obligation. Buyer has full power and authority to enter into and perform this Agreement and the transactions contemplated hereby. Its execution, delivery and performance of this Agreement have been duly and validly authorized by all necessary action on its part. This Agreement has been duly executed and delivered by it and constitutes its valid and binding obligation enforceable in accordance with its terms.

(c)    Absence of Conflicting Agreements or Required Consents. Except for the approval required under the United States Bankruptcy Court, The execution, delivery and performance of this Agreement by Buyer: (i) does not require the consent of any third party; (ii) will not violate any provisions of its organizational charter or Operating Agreement; (iii) will not violate any applicable law, judgment, order, injunction, decree, rule, regulation or ruling of any governmental authority; and (iv) will not, either alone or with the

giving of notice or the passage of time or both, conflict with, constitute grounds for termination of, or result in a breach of the terms, conditions or provisions of, or constitute a default under any agreement, instrument, license or permit material to the transactions contemplated hereby and to which it is now subject.

(d)     Litigation. There are no legal, administrative, arbitration or other proceedings or governmental investigations pending or, to the best knowledge of Buyer, threatened against Buyer which would give any third party the right to enjoin or rescind the transactions contemplated by this Agreement or otherwise affect Buyer's ability to comply with the terms and provisions of this Agreement.

(e)     No Commission or Finder's Fee. Neither Buyer nor any affiliate thereof has any agreement or obligation to pay a commission, finder's fee, or similar payment in connection with this Agreement or any matter related hereto to any person or entity.

(f)     Disclosure. No representation or warranty made by Buyer set forth herein or in any exhibit hereto or schedule referred to herein, or in any certificate or other document delivered in connection with the transactions contemplated by this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statement not misleading.

5. **Covenants of Buyer**

(a)     Closing. On the Closing Date, subject to the condition precedents contained in Section 9 hereof, Buyer shall purchase the Acquired Assets from Seller as provided in Section 1 of this Agreement.

(b)     Assumption of Contractual Obligations. On the Closing Date, subject to the condition precedents contained in Section 8 hereof, Buyer shall assume the Assumed Contracts.

(c)     Further Instruments. After the Closing, Buyer agrees that it will take such actions and execute and deliver to Seller such further instruments of assignment, assumption, conveyance and transfer as, in the reasonable opinion of counsel for Seller, may be necessary to ensure, complete and evidence the full and effective transfer of the Acquired Assets to Buyer pursuant to this Agreement.

6.     **Seller Representations and Warranties**. Seller represents and warrants to Buyer that as of the date of this Agreement and the Closing Date:

(a)     Organization and Standing. Seller is a stock corporation duly organized, validly existing and in good standing under the laws of the State of Delaware. Seller has full power and authority to own and operate the business of Droners as now being conducted.

(b)     Authorization and Binding Obligation. Seller has full power and authority to enter into and perform this Agreement and the transactions contemplated hereby with bankruptcy court approval. The execution,

delivery and performance of this Agreement by Seller has been duly and validly authorized by all necessary corporate action on its/ part, including approval by the United States Bankruptcy Court. This Agreement has been duly executed and delivered by it and constitutes its valid and binding obligation enforceable in accordance with its terms.

(c)     Absence of Conflicting Agreements or Required Consents. Seller's execution, delivery and performance of this Agreement: (i) does not require the consent of any third party other than the United States Bankruptcy Court; (ii) will not violate any provisions of its organizational documents or operating agreement; (iii) will not violate any applicable law, judgment, order, injunction, decree, rule, regulation, or ruling of any governmental authority; (iv) will not, either alone or with the giving of notice or the passage of time or both, conflict with, constitute grounds for termination of, or result in a breach of the terms, conditions, or provisions of, or constitute a default under any agreement, instrument, license or permit individually or in the aggregate material to the transactions contemplated hereby and to which it is now subject; and (v) will not result in the creation of any lien, charge or encumbrance on any of the assets sold hereunder.

(d)     Title to and Condition of Acquired Assets. To the best of Trustee's knowledge, Seller owns and has good title to the Acquired Assets, and none of such Acquired Assets are subject to any security interest, mortgage, pledge, conditional sales agreement, or other lien or encumbrances. To the knowledge of Seller, the tangible Acquired Assets available for immediate use in conduct of the business and operations of Droners.

(e)     Absence of Undisclosed Liabilities. To the best of Trustee's knowledge, there are no other liabilities or liens which encumber any of the Acquired Assets.

(f)     Litigation. Other than the proceeding for bankruptcy filed in the Eastern District of North Carolina, and to the best of Trustee's knowledge, there is no litigation, proceeding, audit or investigation pending or, to the knowledge of the Seller, threatened against Seller in any federal, state or local court, or before any administrative agency or taxing authority which might result in any material adverse effect upon the business, property, assets or condition (financial or otherwise) of Seller or which seeks to enjoin or prohibit, or otherwise questions the validity of, any action taken or to be taken pursuant to or in connection with this Agreement.

(g)     Compliance With Laws. Seller has not received any notice asserting any noncompliance in any material respect by it with any applicable statute, rule or regulation, federal, state or local, or any agency thereof, having jurisdiction over it. Upon information and belief, Seller is in compliance in all material respects with all laws, regulations and governmental orders applicable to the conduct of the business and operations of Seller, and the present use of its assets does not violate any of such laws, regulations or orders.

(h)     Reports. To the extent of Trustee's knowledge, all material returns, reports and statements currently required to be filed by Seller with any other governmental agency have been filed, and all reporting requirements of governmental authorities having jurisdiction thereof have been complied with in all material respects. All such reports, returns and statements are substantially complete and correct as

filed.

    (i)    <u>Assumed Contracts</u>. With respect to each Assumed Contract which, Seller is a party to, such Assumed Contract has fully performed its obligations thereunder; Seller is not in material breach or default, and no event has occurred that with notice or lapse of time would constitute a material breach or default, or permit termination, modification, or acceleration, under such Assumed Contract; and Seller has not repudiated any material provision of such Assumed Contract.

    (j)    <u>No Commission or Finder's Fee</u>. The Seller has no agreement or obligation to pay a commission, finder's fee, or similar payment in connection with this Agreement or any matter related hereto to any person or entity.

    (k)    <u>Disclosure</u>. No representation or warranty made by Seller set forth herein or in any exhibit hereto or schedule referred to herein or in any certificate or other document delivered or to be delivered in connection with the transactions contemplated by this Agreement contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statement not misleading.

    7.    <u>**Covenants of Seller**</u>.

    (a)    <u>Further Instruments</u>. After the Closing, Seller agrees that they will take such actions and execute and deliver to Buyer such further instruments of assignment, conveyance and transfer as, in the reasonable opinion of counsel for Buyer, may be necessary to ensure, complete and evidence the full and effective transfer of the Acquired Assets to Buyer pursuant to this Agreement.

    8.    <u>**Buyer's Conditions Precedent to Closing**</u>. The obligations of Buyer hereunder are, at its option, subject to satisfaction, at or prior to the Closing Date, of each of the following conditions:

    (a)    <u>Representations, Warranties and Covenants</u>

    (i)    All representations and warranties of Seller made in this Agreement, or in any exhibit, schedule, certificate or other document delivered pursuant hereto shall be true and complete on and as of the Closing Date with the same force and effect as if made on and as of that date, except for changes contemplated by this Agreement or changes that are not adverse and arise after the date hereof in the ordinary course of Droners.

    (ii)    All of the terms, covenants and conditions to be complied with and performed by Seller on or prior to the Closing Date shall have been complied with or performed in all material respects.

    (b)    <u>Adverse Proceedings</u>. No suit, action, claim or governmental proceeding shall have been instituted or threatened against, and no order, decree, or judgment of any court, agency, or other governmental authority shall have been rendered against the parties or any party

hereto which would render it unlawful, as of the Closing Date, to affect the transactions contemplated by this Agreement in accordance with its terms.

(c)    No Material Adverse Change. There shall not have been any material adverse change in the property, assets, condition (financial or otherwise) or business of the Seller and Droners.

(d)    Instruments of Conveyance and Transfer. Seller shall have delivered to Buyer all bills of sale, endorsements, assignments and other instruments of conveyance and transfer reasonably satisfactory in form and substance to counsel to Buyer, effecting the sale, transfer, assignment and conveyance of the assets sold hereunder to Buyer including, without limitation, the following:

(i)    Assignment and Assumption Agreement and such other assignments of all licenses, permits and other intangible assets; and

(iii)    Such other instruments or documents as Buyer may reasonably request in connection with the transfer of the assets to be transferred to it hereunder.

(e)    Consents. The United States Bankruptcy Court shall have ordered the transfer of the Acquired Assets as contemplated by this Agreement and Buyer shall have received evidence of such order in a form reasonably acceptable to Buyer. In addition, Buyer shall have received such consents as Buyer deems reasonably necessary with respect to the assumption of each of the Assumed Contracts.

9.    **Seller's Conditions Precedent to Closing.** The obligations of Seller hereunder are, at its option, subject to satisfaction, at or prior to the Closing Date, of each of the following conditions:

(a)    Representations, Warranties and Covenants.

(i)    No representation or warranty by Buyer in this Agreement contains or will contain any untrue statement or omits or will omit to state a material fact necessary to make the statements contained herein not misleading. All representations and warranties of Buyer shall be true and complete in all material respects on and as of the Closing Date with the same force and effect as if they had been ~~as if~~ made on and as of that date.

(ii)    All the terms, covenants, and conditions to be complied with and performed by Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects.

(b)    Adverse Proceedings. No suit, action, claim or governmental proceeding shall have been instituted or threatened against, and no order, decree, or judgment of any court, agency, or other governmental authority shall have been rendered against the parties or any party hereto which would render it unlawful, as of the Closing Date, to affect the transactions contemplated by this Agreement in accordance with its terms.

10. **Closing**

(a)    Closing Date. The sale will be closed on or before March 31, 2024 ("Closing Date") or at such other date, time or place agreed upon by the parties.

(b)    Closing Deliveries.

(i)    At the Closing, Seller shall execute and deliver to Buyer, as applicable, all the following documents and agreements:

(A)    The Bill of Sale, Assignment and Assumption Agreement, and such other instruments or documents as Buyer may reasonably request in connection with the transfer of the assets to be transferred to it hereunder; and

An Order of the Bankruptcy Court, in a form reasonably acceptable to Buyer, authorizing the transactions contemplated herein.

(ii)    At the Closing, Buyer shall deliver to Seller all of the following documents and agreements:

(A) If applicable, executed copies of an authorizing resolution of the members of Buyer, in a form reasonably acceptable to Seller, authorizing the transactions contemplated herein; and

(B) The Assignment and Assumption Agreement, duly executed by Buyer, and such other instruments or documents as Seller may reasonably request in connection with the transfer of the assets to be transferred to it hereunder.

11. **Indemnification Provisions**.

(a)    Indemnification by Buyer. Buyer shall indemnify, defend and hold Seller, their directors, officers, employees and agents of each, and their respective heirs, successors, partners and permitted assigns (collectively, the "Seller Indemnitees") harmless against and from any and all liabilities, obligations, damages and expenses (including reasonable attorney's fees and legal and other expenses incident thereto) of every kind, nature or description (collectively, "Loss" or "Losses")) Losses arising out of:

(i)    The operation or ownership of Droners or any part thereof operated by Buyer after Closing Date.

(ii)    Performance of the Assumed Contracts after Closing.

(iii)    The breach of any of its covenants or other agreements contained in this Agreement or in any instrument delivered in connection with the transactions contemplated hereby.

(iv)    Any misrepresentations, breach of warranty, or nonfulfillment of any of

Buyer's agreement herein, or from any misrepresentation in or omission from any certificate or other instrument furnished or to be furnished to Seller hereunder.

(v)     All actions, suits, proceedings, demands, assessments, judgments and reasonable costs and expenses incident to any of the foregoing subparagraphs of this Section 11 for which Sellers are held liable.

(b)     Notice of Claim. The party entitled to indemnification hereunder (the "Claimant") shall promptly deliver to the party liable for such indemnification hereunder (the "Obligor") notice in writing (the "Required Notice") of any claim for recovery under this Section 11, specifying in reasonable detail the nature of the Loss, and, if known, the amount, or an estimate of the amount, of the liability arising therefrom (the "Claim"). The Claimant shall provide to the Obligor as promptly as practicable thereafter information and documentation reasonably requested by the Obligor to support and verify the Claim asserted, provided that, in so doing, it may restrict or condition any disclosure in the interest of preserving privileges of importance in any foreseeable litigation.

(c)     Defense. If the facts pertaining to the Loss arise out of the Claim of any third party (other than a member of the Buyer Indemnitees or the Seller Indemnitees, whichever is entitled to indemnification for such matter) and indemnification is available by virtue of the

circumstances of the Loss, the Obligor must assume the defense or the prosecution thereof, including the employment of counsel or accountants, at its cost and expense. If representation of both the Obligor and the Claimant by such counsel would be inappropriate due to actual or potential differing interests between the Obligor and the Claimant in such proceeding (such as the availability of defenses to the Claimant), the Claimant (together with all other indemnified parties which may be represented without conflict by one counsel) shall have the right to retain one separate counsel, with the reasonable fees and expenses to be paid by the Obligor. The Claimant shall have the right to determine and adopt (or, in the case of a proposal by Obligor, to approve) a settlement of such matter in its reasonable discretion, except that Claimant need not consent to any settlement that (a) imposes any non-monetary obligation or (b) Obligor does not agree to pay in full. The Obligor shall not be liable for any settlement of any such Claim effected without its prior written consent, which shall not be unreasonably withheld, delayed, or conditioned. Whether or not the Obligor chooses to so defend or prosecute such Claim, all the parties hereto shall cooperate in the defense or prosecution thereof and shall furnish such records, information, and testimony, and attend such conferences, discovery proceedings, hearings, trials, and appeals, as may be reasonably requested in connection therewith.

12.    **Miscellaneous**

(a)    Notices. Any notice, request, demand, instruction or other document to be given or served hereunder shall be in writing and shall be delivered (i) personally, (ii) by nationally recognized overnight courier service, or (iii) sent by United States certified mail, return receipt requested, postage prepaid, addressed to the parties at their last known address. A party may change its address for receipt of notices by service of a notice of such change in accordance herewith.

(b)    Assignment; Binding Effect. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by either party without the prior written consent of the other party. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and assigns, and no other person shall have any right, benefit or obligation hereunder.

(c)    Choice of Law. This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of North Carolina, without considering its law or rules related to choice of law.

(d)    Construction. Each party and counsel for each party have reviewed this Agreement and, accordingly, the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement.

(e)    Invalidity. In the event that any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, then to the maximum extent permitted by law, such invalidity, illegality or unenforceability shall not affect any other provision of this

Agreement or any other such instrument and they shall be construed as if the invalid, illegal or unenforceable provision had never been present. However, none of the provisions hereof are severable for any purpose (including attempts to avoid portions hereof in a bankruptcy proceeding) other than to avoid invalidity, illegality or unenforceability.

(f)     Entire Agreement; Amendments. This Agreement, together with all Exhibits and Schedules hereto, constitutes the entire Agreement among the parties pertaining to the subject matter hereof and this Agreement supersedes all prior agreements, understandings, negotiations, discussions, term sheets and expressions of interest and letters of intent, if any, whether oral or written, of the parties. No supplement, modification or waiver (oral or written) of this Agreement shall be binding unless executed in writing by the party to be bound thereby. No oral agreement or acts of the party shall be construed as modifying this Agreement unless such agreement is executed in writing by all the parties.

(g)     Expenses. Each party hereto shall pay its own legal, accounting, out-of-pocket and other expenses incident to this Agreement and to any action taken by such party in preparation for carrying this Agreement into effect.

(h)     Titles. The titles, captions or headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

(i)     Survival. The representations, warranties, covenants, indemnities and agreements contained in this Agreement are and will be deemed and construed to be continuing representations, warranties, covenants indemnities and agreements and will survive this Agreement for a period of eighteen (18) months following the Closing Date.

(j)     Waiver. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), nor shall such waiver constitute a continuing waiver unless otherwise expressly provided.

(k)     Time of the Essence. Time is of the essence in connection with the transactions contemplated hereby. However, if this Agreement requires any act to be done or action to be taken on a date which is a Saturday, Sunday or legal holiday, such act or action will be deemed to have been validly done or taken if done or taken on the next succeeding day which is not a Saturday, Sunday or legal holiday, and the successive periods will be deemed extended accordingly.

(l)     Misdirected Payments. Seller and Buyer hereby agree that after the Closing Date, any payment received by either party that is identified as a payment for invoices of the other party or otherwise due the other party shall promptly be remitted to the other party upon receipt thereof.

(j)     Multiple Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. For purposes hereof, executed counterparts transmitted by

electronic mail or facsimile shall be deemed originals.

IN WITNESS WHEREOF, this Agreement is executed as of the _____ day of _____, 2024.

**SELLER:**

JOHN C. BIRCHER III, BANKRUPTCY TRUSTEE FOR
PRECISIONHAWK, INC.

By: _____

**BUYER:**

Happy Droning LLC

By: _____

Scott Rosenbaum  , Member

Exhibit A

Bills of Sale

## BILL OF SALE AND ASSIGNMENT OF RIGHTS

KNOWN ALL PERSONS BY THESE PRESENTS:

THAT, **PRECISION HAWK, INC.**, a Delaware stock corporation ("Seller"), for and in consideration of the sum of Fifty Five Thousand Dollars and no cents ($55,000.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, does hereby GRANT, BARGAIN, SELL, CONVEY, ASSIGN and DELIVER unto **HAPPY DRONING LLC,** a Virginia limited liability company ("Buyer"), and unto its successors and assigns, all of Seller's right, title and interest in and to the property described on **Exhibit 1** attached hereto (collectively, the "Property").

TO HAVE AND TO HOLD said Property, all and singular, unto Buyer and Buyer's successors and assigns forever.  Seller hereby covenants with Buyer: (i) Seller is the lawful owner of the Property; (ii) the Property is free from all liens and encumbrances; (iii) Seller has the absolute and unconditional right to convey the Property; and (iv) Seller shall forever warrant and defend the right and title of Buyer to the Property against all claims and demands of all persons whomsoever.

EXECUTED _____ ___, 2024.

### SELLER:

**PRECISION HAWK, INC.**

By: _____

_____,
President

## Exhibit 1

All assets related to the operation of Droners.io, including but not limited to:

(i)    Domain name of Droners.io, any and all website code (currently hosted on AWS), all code repositories (such as Github), all social media accounts and handles (including without limitation Facebook, Linkedin, Twitter (X), Instagram), names, and logins, email system, access to cloudflare (DNS), all website tools and applications, third-party API accounts, all databases (including without limitation drone operators and customers, for example) and access to all credit card processing accounts (including without limitation the Stripe account).

(ii)    Subject to all applicable legal requirements, all business and marketing records, including accounting and operating records, regulatory records, asset ledgers, inventory records, reports, budgets, customer lists, supplier lists, information and data respecting equipment acquired by Buyer, correspondence and mailing lists, email contact lists, blast/mass marketing email lists, drone operator distribution lists, newsletter sign-ups, files relating to contact with customers and prospective customers related to Droners, all technical and descriptive materials relating to Droners and all other business records, in whatever form they exist (the "Business Records").

(iii)    To the extent assignable, all governmental approvals, authorizations, certifications, consents, variances, permissions, licenses, and permits to or from, or filings, notices, or recordings to or with, federal, state, and/or local governmental authorities as well as states and jurisdictions outside of the U.S. (the "Authorizations"), but subject, as to the re-assignability to Buyer, to the procurement of any required consents or approvals, if any.

(iv)   All of the intangible rights and property related to Droners, including Intellectual Property Assets (as defined herein), going concern value, goodwill, telephone, fax and e-mail addresses and listings to the extent that they may be assigned. "Intellectual Property Assets" means all intellectual property owned or licensed (as licensor or licensee) and related to Droners in which Seller has a proprietary interest, including:

(A)   All assumed fictional business names, trade names, registered and unregistered trademarks, service marks and applications;

(B)   all patents, patent applications and inventions and discoveries that may be patentable;

(C)   all registered and unregistered copyrights in both published works and unpublished works;

(D)   all know-how, trade secrets, confidential or proprietary information, customer lists, software, technical information, data, process technology, plans, drawings and blue prints; and

(E)   all rights in internet web sites and internet domain names presently used by Seller related to Droners.

(v)   All contracts, agreements, intellectual property licenses, commitments, arrangements, and permissions to which Seller is a party, whether written or oral, which items are disclosed in Schedule 3 (the "General Contracts"); and

(vi)   All other intangible assets used or usable by Seller in connection with the operation of Droners, not specifically excluded by the terms of this Agreement, including any trademarks, service marks, franchises, copyrights in property of any kind, jingles, licenses, permits and privileges owned or held by Seller and used or useful in the operations of Droners, including any additional such rights acquired between the date hereof and the Closing Date.

$      55,000.00

Exhibit B

Assignment and Assumption Agreements

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION** (the "<u>Agreement</u>") is made and entered into this ___ day of _____, 2024 (the "<u>Effective Date</u>"), by and between **HAPPY DRONING LLC.,** a Virginia limited liability company, and or its nominee or assignee ("<u>Assignee</u>"), and **PRECISION HAWK, INC.,** a Delaware stock corporation ("<u>Assignor</u>") and is as follows:

### RECITALS:

**WHEREAS**, Assignor and Assignee are parties to an Agreement for Sale of Assets, dated _____ (the "<u>Agreement for Sale of Assets</u>"); and

**WHEREAS**, pursuant to the Agreement for Sale of Assets, Assignor has agreed to assign certain rights and agreements to Assignee, and Assignee has agreed to assume certain obligations of Assignor, all as set forth more fully in this Assignment.

### AGREEMENT:

**NOW, THEREFORE,** for and in consideration of the recitals set forth above, the promises and mutual covenants contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, Assignor and Assignee agree as follows:

1. **Incorporation of Recitals**. The recitals set forth above are not mere recitals of fact but are contractual in nature and incorporated into this Agreement by reference, except in the event of a conflict between the incorporated recitals and the numbered sections of this Agreement, the numbered sections of this Agreement shall control.

2. **Capitalized Terms**. All terms used in this Agreement in a capitalized fashion that are not otherwise defined herein shall have the meanings assigned to them in the Agreement for Sale of Assets.

3. **Assignment by Assignor**. As of the Effective Date, Assignor hereby assigns, sells, transfers and sets over to Assignee all of Assignor's right, title, benefit, privileges and interest in and to, and all burdens, obligations and liabilities due and to become due under the agreements related to the operation of Droners.io (all such agreements referred to herein collectively as, the "<u>Assigned Agreements</u>"). Assignor shall indemnify, defend and hold harmless Assignee from all claims, costs, expenses and loss which Assignee may incur in connection with any suit or other related claim or action brought by person claiming any right, title or interest in the Assigned Agreements, prior to the Effective Date with respect to any breach by Assignor or any

act or omission of Assignor arising under or in connection with the Assigned Agreements.

4.    **Assumption by Assignee**.    As of the Effective Date, Assignee accepts the transfer and assignment of all of Assignor's right, title, benefit, privileges and interest in and to, and all burdens, obligations and liabilities due and to become due on or after the Effective Date under the Assigned Agreements. Assignee shall indemnify, defend and hold harmless Assignor from all claims, costs, expenses and losses which Assignor may incur with respect to: (a) the acts or omissions of Assignee from and after the Effective Date, and (b) any suit or other related claim or action brought by any person arising subsequent to the Effective Date with respect to any breach by Assignee of its obligations with respect to the Assigned Agreements.

**IN WITNESS WHEREOF**, the parties hereto have caused their respective duly authorized representatives to execute and deliver this Assignment and Assumption Agreement as of the Effective Date first above written.

**ASSIGNOR:**

**PRECISION HAWK, INC.**

By: _____

President

**ASSIGNEE:**

**HAPPY DRONING LLC.,**

By: _____

Member

Exhibit C

Form 8594

Schedule 1

Authorizations

Schedule 2

Assumed Contracts

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NORTH CAROLINA
RALEIGH DIVISION

IN RE:

PRECISIONHAWK, INC.                                   CASE NO:  23-03634-5-PWM

                 DEBTOR                                        CHAPTER 7


NOTICE OF TRUSTEE'S MOTION FOR AN ORDER: (1) APPROVING BIDDING
PROCEDURES AND BREAKUP FEE FOR SALE OF CERTAIN DEBTOR'S ASSETS; (2)
AUTHORIZING SALE OF CERTAIN ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND
TRANSFERRING LIENS TO PROCEEDS OF SALE

        NOTICE IS HEREBY GIVEN of the TRUSTEE'S MOTION FOR AN ORDER: (1)
APPROVING BIDDING PROCEDURES AND BREAKUP FEE FOR SALE OF CERTAIN
DEBTOR'S ASSETS; (2) AUTHORIZING SALE OF CERTAIN ASSETS FREE AND CLEAR
OF ALL LIENS, CLAIMS AND ENCUMBRANCES AND TRANSFERRING LIENS TO
PROCEEDS OF SALE ("Motion") filed simultaneously herewith in the above captioned case;
and,

        FURTHER NOTICE IS HEREBY GIVEN that this Motion may be allowed provided
no response and request for a hearing is made by a party in interest in writing to the Clerk
of this Court within TWENTY-ONE (21) DAYS from the date of this notice; and,

        FURTHER NOTICE IS HEREBY GIVEN, a hearing will be held on the Motion and
any responses on March 19, 2024 at 10:30 a.m. at the United States Bankruptcy Court, 2nd
Floor Courtroom, 300 Fayetteville Street, Raleigh, North Carolina.  Any party requesting a
hearing shall appear at the hearing in support of such request or he may be assessed Court
costs.  If no request for a hearing is timely filed, the Court may rule on the Motion and
response *ex parte* without further notice.  Any party filing an objection requesting a hearing,
shall appear at the hearing or they may be taxed with Court costs.


        Dated: 02/16/2024

                                        s/John C. Bircher III
                                        John C. Bircher III
                                        N.C. State Bar No. 24119
                                        DAVIS HARTMAN WRIGHT LLP
                                        209 Pollock Street
                                        New Bern, NC 28560
                                        Telephone/Facsimile 252-262-7055
                                        Email: jcb@dhwlegal.com